# 22-887

## United States Court of Appeals

*for the*

## Second Circuit

Esther Solomon

*Plaintiff-Appellant,*

v.

Fordham University

*Defendant-Appellee.*

_____

On Appeal from a Judgment of the United States District
Court For the Southern District of New York

## BRIEF FOR PLAINTIFF-APPELLANT

Esther Solomon
140 West 62nd Street
New York, NY 10023
(212) 636-6187
*Plaintiff-Appellant pro se*

# TABLE OF CONTENTS

Jurisdictional Statement................................................................ 1

Issues Presented for Review ......................................................... 2

Preliminary Statement .................................................................. 3

Statement of Facts ....................................................................... 6

    The Plan in their Own Words.................................................. 6

    Adverse Actions and Waves of Retaliation............................. 9

    Backdrop: Discriminatory Pattern Over Years ..................... 18

    Pay Discrimination Documentary Evidence .......................... 28

    Comparator Professors ....................................................... 34

    Discriminatory Intent Examples........................................... 38

Argument .................................................................................. 41

Point I: Plaintiff Plausibly Alleges a Discrimination Claim.................. 41

Point II: Plaintiff Plausibly Asserts Retaliation Claims ...................... 51

Point III: Plaintiff Plausibly Asserts a Hostile Work Environment Claim............ 58

Point IV: Plaintiff Plausibly Alleges the Pay Discrimination Claims ................... 61

Point V: The District Court's Procedural Errors Prejudiced Plaintiff's Case ........ 69

Point VI: State Claims Should Be Reinstated ...................................... 74

Conclusion ................................................................................. 74

Certificate of Compliance.............................................................. 74

## Cases

*AMTRAK v. Morgan,* 536 U.S. 101 (2002) .............................................................59

*Burlington N & Santa Fe Ry. v. White*, 548 U.S. 53 (2006)................................46, 51

*Butler v. New York Health & Racquet Club*, 768 F. Supp. 2d 516 (SDNY. 2011).....................68

*Chepak v. Metro. Hosp.*, 555 F. App'x 74 (2d Cir. 2014)................................................62

*Chertkova v. Connecticut Gen. Life Ins. Co.,* 92 F.3d 81 (2d Cir. 1996)....................48

*Corning Glass Works v. Brennan*, 417 U.S. 188 (1974)...........................................62, 65

*Davis-Garrett v. Urban Outfitters*, Inc. 921 F.3d 30, 42 (2d Cir. 2019)................................52, 59

*Delaware State College v. Ricks,* 449 U.S. 250 (1980)................................................50

*EEOC v. Port Authority of New York & New Jersey*, 768 F.3d 247 (2d Cir. 2014) ...................36

*Freyd v. Univ. of Or.* 990 F.3d 1211 (9th Cir. 2021) .................................................65

*Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93 (2d Cir 2010)....................................47

*Green v. Brennan*, 136 S. Ct. 1769 (2016)...............................................................46, 49

*Gregory v. Daly*, 243 F.3d 687 (2d Cir. 2001) ............................................................60

*Hicks v. Baines*, 593 F.3d 159 (2d Cir. 2010) .............................................................12

*In re DeRogatis,* 904 F.3d 174 (2d Cir. 2018)............................................................45

*Jamilik v. Yale Univ.*, 362 F. App'x 148 (2d Cir. 2009) ..............................................67

*Kassman v. KPMG LLP*, 925 F. Supp. 2d 453 (S.D.N.Y. 2013) ...................................63

*Lavin-McEleney v. Marist Coll.,* 239 F.3d 476 (2d Cir. 2001) ...................................64

*Le Grand v. Walmart Stores East LP,* 779 Fed. Appx. 779 (2d Cir. 2019) ...................53

*Lenzi v. Systemax, Inc.,* 2015 U.S. Dist. LEXIS 145479 (E.D.N.Y. 2015)...................63

*Lenzi v. Systemax, Inc.,* 944 F.3d 97 (2d Cir. 2019)...................................................68

*Littlejohn v. City of N.Y.*, 795 F.3d 295 (2d Cir. 2015) ..................................42, 43, 51

*Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293 (2d Cir. 2021) ...............42, 51

*Logan v. Denny's, Inc.*, 259 F.3d 558 (6th Cir. 2001) ..................................................49

*Marks v. Smith* 65 A.D.3d 911 (1st Dept. 2009) .........................................................34

*Menaker v. Hofstra Univ.,* 935 F.3d 20 (2d Cir. 2019) ......................................44, 55, 69

*Miranda v. B & B Cash Grocery Store, Inc.,* 975 F.2d 1518 (11th Cir. 1992) ...............61

*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002) ......................................53

*Nicosia v. Amazon.com, Inc.,* 834 F.3d 220 (2d Cir. 2016) ........................................70

*Palkovic v. Johnson*, 150 Fed. Appx. 35 (2d Cir. 2005) .............................................71

*Penn. State Police v. Suders*, 542 U.S. 129 (2004) .....................................................46

*Petrosino v. Bell Atl.* 385 F.3d 210 (2d Cir. 2004)........................................................47

*Rasmy v. Marriott Int'l Inc.*, 952 F.3d 379 (2d Cir 2020) ............................................57

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000) ...........................67

*Schafer v. Direct Energy Servs.*, LLC, 845 Fed. Appx. 81 (2d Cir. 2021) ...................71

*Shultz v. Congregation Shearith Israel,* 867 F.3d 298 (2d Cir. 2017) ....................46, 49

*Stern v. Trustees of Columbia Univ.*, 131 F.3d 305 (2d Cir. 1997)...............................44

*Varity Corp. v. Howe,* 516 U.S. 489 (1996) ...................................................................45

*Vega v. Hempstead Union Free Sch. Dist.,* 801 F.3d 72 (2d Cir. 2015) .........43, 51, 68

*Vengalattore v. Cornell Univ.,* 36 F.4th 87 (2d Cir. 2022) ...........................................42

*Xanthakos v. City Univ. of N.Y.*, 2020 U.S. Dist. LEXIS 153272 ((S.D.N.Y. 2020) ...................63

*Yoon v. Fordham Univ. Faculty & Admin. Ret. Plan*, 2004 U.S. Dis. LEXIS 26070 (S.D.N.Y. 2004)........................................................................................................33

*Yoon v. Fordham Univ. Faculty & Admin. Ret. Plan,* 263 F.3d 196 (2d Cir. 2001)....................33

**Amicus Curiae Briefs**

American Association of University Professors, *Amicus Curiae Brief* in Support of Plaintiff-Appellant in *Freyd* (Ninth Circuit).............................................................................65

JURISDICTIONAL STATEMENT

On March 29, 2022, the United States District Court for the Southern

District (Hon. Edgardo Ramos) entered final judgment against Plaintiff-

Appellant on all claims. Plaintiff filed a notice of appeal on April 22. 2022. The

court has jurisdiction over this matter under 28 U.S.C. §1291.[1]

Procedural Background

Plaintiff filed the Federal Complaint on May 24, 2018.  She amended on

March 13, 2019, April 15, 2020, and June 11, 2021.

Discovery took place between February 2019 and April 12, 2019. By

subpoena, on November 8, 2019, Plaintiff requested her personnel file and those

of fourteen comparator professors per Fordham Statute §4-07.42 (JA251).

Fordham objected. On March 17, 2020 the District Court denied Plaintiff's

Motion to Compel Subpoenas and Discovery (JA545) and stayed discovery.

Order-I, SPA32, footnote 16.

Following Order-III, Plaintiff filed a Motion for Reconsideration and/or

Rule 54(B) Certification on June 18, 2021 (Brief, Dkt. 97), authorized by the

---

[1] An attorney assisted with preparing the Joint and Special Appendix and some
editing of this brief.

June 24, 2021 Court Order (SPA85). Following Court Order-IV, the Clerk

entered Judgment on March 29, 2022.

Codes for The Appeal Brief

"Complaint" refers to the Third Amended Complaint ("TAC"). The TAC

added its latest section to the front of the complaint body, ¶¶328-535 (JA23-69).

The earlier complaint sections continue with ¶¶1-327 (JA70-124), containing the

original complaint and amendments. The 37 Exhibits are in JA127-426.

The District Court's Four Main Orders are referenced as follows:

"Order-I" = the March 17, 2020 Order, SPA2-32
"Order-II" = issued December 29, 2020, SPA35-69
"Order-III" = issued June 4, 2021, SPA73-84
"Order-IV" = issued March 29, 2022, SPA111-131

## ISSUES PRESENTED FOR REVIEW

1. Did Plaintiff allege facts sufficient to render plausible her

gender/age/religion discrimination and retaliation claims under Title VII of the

Civil Rights Act of 1964, Title IX of the Education Amendment, the ADEA, and

the Equal Pay Act?

2. Did the district court err in granting Defendant's Rule 12(b)(6) motion

to dismiss Plaintiff's complaint against Fordham for (Title VII, IX, ADEA,

Equal Pay Act) discrimination and retaliation despite detailed and plausible

allegations and the requirement that the court shall not make findings of fact at the pleading stage of a civil action?

3. Did the District Court err in relying on administrator emails containing Fordham defenses to disregard the constructive discharge and termination as adverse retaliatory actions and by using extraneous materials and inappropriate findings of fact

4. If one or more of Plaintiff's Federal Claims of action are maintained, should the Court vacate and remand for reconsideration the Court's decision not to exercise jurisdiction over Plaintiff's state law claims?

## PRELIMINARY STATEMENT

Professor Esther Solomon filed this action against Fordham to address wrongs based on her age, gender, and religion, culminating in her constructive termination. Plaintiff has been a tenured management professor at the Fordham Business School for over 35 years and exclusively a graduate professor for ~25 years. She joined in 1984, achieving tenure and promotion to Associate Professor in 1987.

Plaintiff has served Fordham in multiple capacities. Her business colleagues repeatedly elected her, and she represented the Business School faculty in the University Faculty Senate. She has published research in her areas

3

of expertise: senior leadership dynamics, process-oriented innovations, and corporate governance, applying the mathematically oriented methodology of Facet Theory. In 2021, Plaintiff published her book *Facet Theory in Organizational Researc*h as editor and author. As President of the International Facet Theory Association, she organized a conference in 2015 (and again in 2021). For the 2015 conference held at Fordham, she brought world experts and obtained supporting grants from Cornell University and the Society for Multivariate Experimental Psychology.

This case presents extraordinary actions by Fordham against a tenured professor in a significant deviation from standards and norms in the academic profession. Moreover, the secret terminations and retaliatory actions against a professor without cause or due process during federal litigation are unheard of — Plaintiff could find no comparable case.

Multiple retaliatory actions ensued after Plaintiff filed this lawsuit. She was demoted to the undergraduate Bronx campus from the Lincoln Center graduate school, which persisted even after the 2020 Court finding that her allegations pled an illegal adverse action. She had no choice but to accept unpaid leave, sacrificing her salary and pension contribution instead of accepting the humiliating, discriminatory demotion.

In an unprecedented move against a tenured faculty member, Fordham secretly terminated her without cause or due process. But to Plaintiff, they asserted that she remained a tenured faculty. Her pleas for mandated due process to the Fordham President were denied as they stripped her tenure. According to the Statutes, Fordham violated Plaintiff's tenure rights, her university contract, and defamed her as a Professor.

Plaintiff suffered a pattern of discrimination over the years by male supervisors and administrators, using secrecy and other methods to discriminate, blocking her progress, and creating a glass ceiling. The earlier discriminatory actions included: repeated procedural irregularities blocking her promotion applications in 2001 and 2003; her removal as Management Area Chair after her appointment in 2013; the 2016 attempts against Plaintiff and another older female Senator to bring them on false Code of Conduct charges, potentially leading to dismissal. JA113 ¶¶254-255. The later actions will be detailed below.

She also suffered gender-based pay discrimination, her salary being about half that earned by her male comparators.

Actions against Plaintiff were part of a pattern of targeting protected class professors to force them out of their tenured positions, using similar methods. Several were transferred/demoted from their graduate professorships at the Lincoln Center campus to the undergraduate Bronx campus. Some were falsely

accused and had their benefits removed as they were forced out. (¶¶, 304-311, 143-146, 367-368).

As another older professor wrote:

"Thank you for your concerns. Yes, I am not coming back. I have been exposed to concerted efforts of the new regime to push me out. I have been requested to teach undergraduates basic statistics and criticized for some snow days I missed due to illness…They stopped my salary already, now I have to get some health insurance, and then I will fight for my retirement income."

This was a harbinger of what Plaintiff would face.

## STATEMENT OF FACTS

### The Plan in their Own Words

Fordham administrators signaled their plans for Plaintiff.  In November 2017, the male Chair of her Area, Dr. Pirson, had prophetic threats, *"either you will teach in the Bronx, or you do not teach at all."* Either she would accept the demotion or face the consequences. JA26 ¶344.

Dr. Pirson made other non-solicited written references to Plaintiff not returning to Fordham, i.e., "retirement." In December 2016, Dean Rapaccioli wrote to Plaintiff, encouraging her to resign from her tenured position and take "phased retirement." JA58 ¶496

When first informed that Plaintiff had been teaching graduate leadership courses, Dr. Pirson expressed surprise, saying: "you are teaching leadership?" as

if a woman should not be doing so. After he took over as Chair, Plaintiff never taught Leadership again. Instead, Dr. Pirson does. JA58 ¶495.

In a prophetic email, Dean Rapaccioli sketched out her plans. After Plaintiff's Fall 2018 leave under the Family Medical Leave Act, the Dean telegraphed future actions – pay her nothing and deny her any opportunity. The Dean wrote:

> "I would prefer she take the entire term off without Fordham paying her anything, but do we have to offer her the opportunity to return in 8 weeks?" (JA26 ¶343; JA345-346 Exhibit 26, Dean's August 1, 2018 email)

In another irregular connection, Dr. Pirson received legal advice from Fordham's attorney, Mr. Lippiello, noted in email chains implementing the Spring 2018 adverse action schedule against Plaintiff. JA29 ¶356; JA352-356 Exhibit 28, Series of emails on Spring 2018

Collaboration Among Four: 2017 False Code of Conduct Charges

But they went further. In late 2017, false Code of Conduct charges against Plaintiff were hatched by collaboration among VP Crystal, Dean Rapaccioli, and Drs. Pirson and Hollwitz.  Under the Fordham Statutes, their charges would be the prelude to her removal, as had been used previously against others with tenure.

On December 21, 2017, Dean Rapaccioli sent Plaintiff three false Code of Conduct accusations, punishable by loss of tenure and termination through the

faculty disciplinary process. JA136-137, Exhibit 3. The Dean's email addressed to Plaintiff was copied to VP Crystal and Dr. Pirson. The plaintiff unsuccessfully asked for specifics about what she was accused of and due process. Plaintiff sent copies to EEO Officer Coleman. JA27 ¶346; JA293-296. Exhibit 20C; JA348-350 Exhibit 27. No answer or investigation followed.

Unbeknownst to Plaintiff, the Dean failed to disclose that VP Crystal had *secretly authored* the Code of Conduct charges. In an email obtained in the limited discovery, VP Crystal had written to the Dean on December 21, 2017:

> "Hi Donna,
> If you choose to answer Esther, I wanted to provide you with the language from the Code of Conduct. It's in Section 6-03.01. Violations of the Code of conduct include:
> (e) Harassment (verbal or other) ...
> (h) Engaging in, or inciting others to engage in, conduct which interferes with or disrupts any University function, or which prevents or limits the free expression of ideas by others
> G) Engaging in ... disorderly conduct"
> Let me know if I can be of any help.
> Best, Jonathan"      JA348, Ex 27

Dr. Crystal, as Vice Provost, was supposed to investigate disciplinary charges against faculty, not author them out of a hat as a secret prosecutor. His dual role as author and prosecutor violated due process procedures in the Fordham Statutes and abrogated the appropriate investigative procedures, such as those included in their Whistleblower Policy. JA27-29, ¶¶345-355; JA55, ¶470; JA56,¶473; JA57, ¶484; JA74-75 ¶¶30-36; JA136-137 Exhibit 3.

But Fordham rebuffed Plaintiff's requests to the Provost, VP Crystal, the Dean, and Area Chair Pirson for specifics, documentation, or a "modicum of information" about these serious charges. If they believed there had been possible misconduct, the administrators had a duty to follow the due process required under the Fordham Statutes, §4-07.13 Disciplinary Action. Under this Statute, violators of the Code of Conduct are subject to loss of tenure and dismissal.

The email series is in Exhibit 20C, JA293-296. The details are in JA118-119, ¶¶295 -300; JA25 ¶338; JA55 ¶¶470-471; JA337-338, Exhibit 25, Fordham Statues: Disciplinary Action.

<u>Adverse Actions and Waves of Retaliation</u>

<u>Demotion and Transfer as of 2018</u>

Plaintiff taught exclusively in Graduate Business Programs for about 25 years. However, for the Spring Semester 2018, Plaintiff was demoted to the undergraduate school at Rose Hill, The Bronx. The involuntary transfer was inappropriate for Plaintiff, given her tenure, seniority, and expertise. JA70 ¶1; JA36 ¶383.

Nor did the males in the Area suffer this demotion/reassignment to the undergraduate school. Instead, the Area males benefited from forcing out Plaintiff. JA48 ¶432; JA JA60 ¶509 Nor did the younger female faculty suffer

the same fate in age-plus gender discrimination. JA36 ¶383. The pattern of

exiling protected class tenured professors to the Bronx campus had been a

longstanding practice in Management to force them out, e.g., Drs. Hessel,

Zeleny, Orsini, Wright, etc.

In Order-1 of March 17, 2020, the Court found that, as alleged by

Plaintiff, the Bronx demotion and transfer "amounted to an adverse employment

action." SPA 2. After the Court Order, however, Fordham persisted with waves

of retaliatory adverse schedules. While on unpaid leave, Plaintiff initially

received employee benefits as required for faculty on temporary leaves. But

when Fordham failed in forcing her out, in Spring 2020, they terminated her and

removed all benefits, JA32 ¶372

Because it is so extraordinary to take such actions secretly against a

professor in violation of her property and liberty rights, Fordham covered it up.

Administrator emails misrepresented the Fordham Statutes and the

COBRA/ERISA rules to pretend, in convoluted arguments, that the termination

outcomes are simply characteristics of university authorized unpaid leaves.

Ongoing Waves of Retaliation

Tenured Professor Termination Without Cause or Due Process

Plaintiff suffered waves of retaliation, with Fordham secretly changing

her employment terms, depriving her tenure rights without the due process she

requested, all in temporal proximity to her protected actions. Her loss of salary, loss of health benefits, loss of life and disability insurance, loss of retirement benefits, and loss of access to teaching as a graduate professor with seniority are all characteristics of escalating adverse actions. JA24 ¶¶333-334.

The termination is documented in Fordham's official reports through the COBRA/ERISA federal program regulated by the IRS and the Department of Labor.  To cover up the terminations, Fordham misrepresented to Plaintiff and the Court the facts, their Statutes, IRS rules, and those of COBRA/ERISA applicable to faculty. They falsely portrayed termination outcomes as features of unpaid leaves and supposedly "customary."

Even before the 2020 termination, Plaintiff warned the Court and asked the Fordham President for due process.

Hearing Before the District Court on January 29, 2020

Three days before the February 1 termination, during the January 29, 2020 discovery hearing, Plaintiff alerted the Court to Fordham's plan to terminate her and her previous request for a hearing to the Fordham President, which Dr. Crystal had denied:

> "And what I say is, essentially, that's taking my tenure without due process of law, and then under the eyes of the Court they are saying they're trying to be helpful." JA522.

At that hearing, she also told the Court:

"But the idea is they wanted to deny me the right to a hearing. Basically, I'm here in a very difficult situation and I've essentially lost my tenure without them allowing me to have a hearing, and I am in a very, very difficult situation." JA41 ¶399

Plaintiff's Request to President for Hearing and Due Process Denied

A month before the February 1, 2020 secret termination, Plaintiff appealed to Fordham's President, requesting due process as she was warned by Dr. Crystal that all her faculty benefits would be removed. JA122-123 ¶320; JA300-303 Exhibit 22A. As Plaintiff noted to the President on January 2, 2020:

"As outlined in the Fordham Statutes, such adverse University action requires prior reviews and determination by the Faculty Hearing Committee §4-07.12 and should involve the Faculty Senate Executive Committee. Instead, this appears to be an undisclosed, de facto tenure termination, bypassing due process. Please clarify, and if there are any implied charges, I am hereby requesting to be given notice, a formal hearing and the opportunity to be heard, exercise my full rights and defend myself…"

These Fordham terminations were documented in their reports under federal requirements.

Table 1 below provides a synopsis of adverse actions during the federal lawsuit. The discrimination and retaliation acts should be considered in the aggregate, as the alleged acts of retaliation need to be considered "both separately and in the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable." *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010). For analysis purposes, they are divided into three groups of adverse actions. A32-33.

**Table 1**
Retaliatory Adverse Actions during EEOC & Federal Litigation
2018 to Present

| Semester | Adverse Action A | Adverse Action B | Adverse Action C |
|---|---|---|---|
| | **Demotion & Adverse Action (AA) Schedule** | **Faculty Payroll Benefits** University Health Plan IRS req., Life Ins, Pension, Disability. | **Fordham Reported Official Faculty Status to** COBRA/ERISA – Dept of Labor, Treasury, IRS |
| **Spring 2018** | Demotion & AA Schedule => Full-time teaching | Benefits | *Federal Complaint 5/24/2018* |
| **Fall 2018** | Family Medical Leave (FMLA) | Benefits | --- |
| **Spring 2019** | Demotion & AA Schedule =>Forced Leave Without Pay | Benefits | Normal |
| | | Removed from Health Plan: May 2019, and July 2019 (HC Twice restored by Attorney Ms. Crosson) | *Amended Complaint 3/13/2019* Termination #1 4/12/2019 |
| **Fall 2019** | Demotion & AA Schedule => Forced Leave Without pay | No Benefits | --- |
| **Spring 2020** | Demotion & AA Schedule =>Forced Leave Without Pay | No Benefits | *Subpoenas 11/2019* *Hearing Request Pres. 1/2/2020* Termination #2   2/1/2020 |
| **March 17, 2020 COURT ORDER** SPA2 | | | |
| **Fall 2020** | Demotion & AA Schedule Despite knowledge of March 17, 2020 Court Order Attempted to teach-Sabotage =>Forced Leave Without Pay | No Benefits | *Second Amend Compl 4/16/2020* Post-Termination Report: "Reduction in Hours and Status Change" 8/31/2020 |
| **Spring 2021** | Demotion & AA Schedule =>Forced Leave Without Pay | No Benefits | -- |
| **Fall 2021** | Demotion & AA Schedule =>Forced Leave Without Pay | No Benefits | -- |

CONSTRUCTIVE DISCHARGE

TERMINATION

Termination #1:

    Event Date:  4/12/2019– Event Type: Termination. JA317, Exhibit 23

Termination #2 :

    Event Date:  2/1/2020  – Event Type: Termination. JA318, Exhibit 23

The rule by which Fordham reported the terminations is as follows:
    "COBRA Section 2590.606-2 Employer's Notice of Qualifying event:
    Section 606 (a)(2) of ERISA requires an employer to provide notice to the
    plan administrator of a qualifying event that is either the employee's
    termination of employment or reduction of hours of employment …"
    Federal Register 29 CFR Part 2590 Department of Labor Final Rule
    March 26, 2004." JA323, Exhibit 24

    Plaintiff received the above COBRA/ERISA Notices from Discovery

Benefits, Fordham's administrator for the Department of Labor's COBRA

program. Fordham *never* notified her, although their internal records indicate

"Terminated." JA25 ¶335; JA317-319 Exhibit 23, Report of Termination;

JA321-326 Exhibit 24, COBRA Regulations.

    The February 1, 2020 COBRA termination letter stated: "You are

receiving this letter because on 2/1/2020 you experienced an event of a/an

Termination which constitutes a qualifying event under the Fordham University

group health plan(s)."  The COBRA Notice indicates the cost of approximately

$41,000 annually to continue health insurance, which lasts for 18 months. After

that, on her own. She was also deprived of her salary for Spring 2020 of

~$60,000 per semester by Fordham's refusal to allow her to teach a regular, non-

adverse, non-discriminatory schedule. JA121 ¶315; JA34 ¶377-378; JA25 ¶337; JA122 ¶¶316-317; JA317-319, Exhibit 23

Post-Termination Workplace Sabotage:

The following is excerpted from JA60-62 ¶¶504-510

Plaintiff's Attempt to Return for Fall 2020 Semester

After the March 17, 2020 Court order and the April 16, 2020 Second Amended Complaint, Fordham intensified their actions. Plaintiff made another effort to teach the Fall 2020 semester. Within a week, she was notified of new punitive assignments, a "Hobson's choice" she accepted to avoid losing her life's work.  But she soon faced workplace sabotage.

- On July 22, after she had putatively been given a Fall schedule in May 2020, the Office of the Provost informed Plaintiff that she had *no classes* listed for the Fall 2020 semester. They asked whether Plaintiff was "planning on an unpaid unbenefited leave for the Fall semester?"

- On July 30, an Associate Dean informed her that there was no record of her as a faculty member in Fordham's information management database, the Banner, consistent with the termination reports.

- On August 3, 2020 Plaintiff wrote to the President requesting to intervene and restore her to the graduate programs.

15

- On August 10, she found out that all her classes on the Blackboard were disabled, indicating "no teaching assignments." Blackboard Learn is Fordham's online learning management system.

- She wrote the President on August 10 that her Fall 2020 courses had been removed and asked about the implications for her status. Plaintiff made inquiries, but IT confirmed that no other faculty had their Blackboard disabled.

- On August 25, Plaintiff was denied *faculty access* to Area course teaching materials. Dr. Pirson would only grant her *student access* and emailed her student id credentials, humiliating her in a public email. She never did get faculty access.

- Plaintiff was again denied access to the Graduate schedules of other faculty, part of the long-standing secrecy

Post-Termination Notice as Hourly Employee

At the end of the summer, Plaintiff received the August 31, 2020 post-termination notice from COBRA/ERISA. It stated:

Event Date: 8/31/2020 Event Type Reduction in Hours, Status Change: JA319, Ex. 23

The August 31, 2020 "Reduction in Hours-Status Change" is not applicable since faculty are not hourly employees: Statute 4-03-01 (a)

Appointment as a faculty member is a contract for full-time engagement in

faculty responsibilities during the academic year. JA23, Exhibit 18, Fordham

Statutes. According to the Fordham University Statutes, these actions violated

Plaintiff's tenure rights and her contract with the University. JA25 ¶338; Exhibit

25; Tenure Statutes.

<u>Contradictory Reports to Different Federal Entities</u>

Table 2 below presents Fordham's contradictory representations to the

District Court and Plaintiff versus those filed with the Department of Labor and

the IRS COBRA/ERISA program through Discovery Benefits. JA40 ¶398.

| Fordham Notice to Plaintiff of Upcoming Action Against Plaintiff | Fordham Notice to the Court of Upcoming Action Against Plaintiff | Fordham Secret Report to COBRA/ERISA through Discovery Benefits |
|---|---|---|
| *3/17/2019 Filed 1st Amended Complaint*<br><br>No Notice of Action | 4/10/2019 Fordham to Court Dkt. 39<br><br>"Dr. Solomon will not be prejudiced by a stay of discovery pending Fordham's motion to dismiss. ...More importantly, Dr. Solomon is a current tenured professor in Fordham's Gabelli School of Business and the <u>status quo remains</u> preserved." | 4/12/2019<br><br>Action: Termination |
| 1/9/2020 Dr. Crystal<br><br>.... "During Spring, 2020 you will retain your status as a tenured faculty member. [*Def Reply Ex A, Dkt-82-1, 08/24/2020)*]<br><br>12/23/2019 Dr. Crystal:<br>"The Provost's office will honor your request for an unpaid leave but will not cover the costs of medical benefits during the leave". [*SAC p 266-Ex 22*] | 1/29/2020<br>.<br>Fordham Atty: ... "Your Honor, Dr. Solomon is a tenured faculty member at Fordham University and remains a tenured faculty member at Fordham University.... Yes, she remains a tenured professor at Fordham University today".<br>(Court Hearing Dkt. 67) | 2/1/2020<br><br>Action: Termination |
| 8/14/2020 Dean Rapaccioli:<br><br>"As you have requested, the University will grant your request for an unpaid leave for the fall semester... the leave will be without benefits". | 8/24/2020 Reply Dk.81<br>Not Mentioned | 8/31/2020<br><br>Action: Status Change- Reduction in Hours |

Fordham also misrepresented its Statutes to fabricate that their termination was merely a type of faculty leave. In their 2019 and 2020 emails, the Dean and Dr. Crystal stated that discontinuing all tenured faculty benefits, removing her from the University health plan, and discontinuing pension contributions, life insurance, disability insurance, and removal from the payroll are normal or "customary" during faculty authorized leave. They are not. JA26 ¶34. Nor is Dean Rapaccioli's statement about the purported non-existent "customary policy" correct. That is in her May 24, 2019 email to Plaintiff. JA384, Exhibit 31.

Backdrop: Discriminatory Pattern Over Years

Comparators as Competitors: A Motive for the Discrimination

As of 2003, the female professors in the Department of Management, Drs. Mooney and Plaintiff, outlined in a memo to the Faculty Senate Executive Committee their disparate treatment, including exclusion from teaching and administrative opportunities, executive MBA programs, and other benefits and privileges, etc. They noted the lack of transparency by the male chairs. JA96 ¶144; JA96 ¶¶143; JA200-201, Exhibit 13.

Things had not changed ~15 years later. She was still precluded from appropriate leadership, administrative, managerial, and teaching opportunities. The male supervisors disproportionately assigned her to the late evening 8-10

pm undesirable time slots, leading to lower student enrollment which predictably would have a harmful, adverse effect upon her. JA81 ¶55.

On October 27, 2017, Plaintiff wrote again to senior administrators. She noted the discrimination and her preclusion from "all administrative or quasi-managerial tasks…[and] appropriate leadership and teaching opportunities particularly in the graduate MBA, MS, MA and Ph.D. programs…and am being marginalized …" She continued:

> "It does not appear appropriate that senior Fordham Administrators tum a blind eye to these ongoing actions." JA82 ¶57; JA170-174 Exhibit 10.

But that is what they did.

During most of Plaintiff's tenure at Fordham, males, Drs. Wharton, Sen, Hollwitz, and later Pirson have dominated as Chairs of Management Systems. JA113 ¶254. Both Drs. Hollwitz and Pirson became Management Chairs after procedural irregularities precluding Plaintiff from being Area Chair for 2013-2016 and again in 2017.

Management assignments have been based on undisclosed criteria, and information about these programs, including development, staffing, and administration was tightly controlled, blocking opportunities for qualified faculty. JA96 ¶144; JA200-201, Exhibit 13. For example, as Chair, Dr. Sen replied when asked about teaching distribution: "I will not tell you what other programs there are and who is teaching them, even if both Deans [Graduate

Dean Gauchi and Dean Rapaccioli] tell me I have to disclose those schedules."
JA115 ¶268.

Similarly, on October 8, 2019, Plaintiff asked Dr. Pirson, "what other
Graduate courses and leadership courses will be offered as electives ... next
semester..." Again, Dr. Pirson did not disclose but asserted supposed "privacy
concerns" about scheduling which should be transparent. JA115 ¶267.

Until her demotion in 2018, Plaintiff and her comparators taught the
Graduate Principles of Management Course, as they were interchangeable for
these introductory sections and some graduate electives. The jobs had the same
core content requiring equal skill and responsibility. Plaintiff taught graduate
leadership courses. Upon Plaintiff's demotion/transfer, Drs. Hollwitz and
Pirson replaced her in the graduate classes. JA47 ¶425.

The comparators benefitted from the discriminatory treatment they meted
out to Plaintiff. With Plaintiff excluded, they could teach her graduate courses.
The Graduate School has had decreasing enrollments, and fewer Graduate
courses were left in LPO after the Management Systems breakup in 2017. In his
March 30, 2019 email, Dr. Hollwitz summed it up: "we have fewer and fewer
opportunities for masters-level teaching." JA47 ¶429; JA418 Exhibit 35.

Although Plaintiff has the highest seniority and experience teaching
Graduate MBA students, she was demoted and reassigned to the most

20

elementary, time-consuming, low-responsibility undergraduate courses. JA48 ¶430.

The males fostered the discriminatory application of graduate course prerequisites, impossible for students to meet, on Plaintiff for Spring 2018. The males subsequently removed them to enable student enrollment in the *males'* graduate electives so *their graduate courses* would not be canceled, as had Plaintiff's. JA50 ¶¶443-446. When these impossible student prerequisites would have caused their graduate classes to be canceled, they voted to overturn them.

Earlier Actions: Backdrop to Recent Ones

A. Promotion Irregularities in 2001, 2003 Applications

Dr. Solomon was improperly denied promotion on two occasions, although she was as qualified as similarly situated males, non-Jewish faculty, and younger females. Moreover, the promotion reviews did not comply with Fordham's procedural requirements in many respects.

An incident providing context and background includes the obstacles Plaintiff faced when she applied for promotion. Multiple procedural and other irregularities obstructed Plaintiff's application for promotion in 2001 and 2003, supporting the pervasive discriminatory intent.

Between 2004 and 2007, Plaintiff made multiple attempts to get a hearing regarding the denial of her 2003 promotion to Full Professor. Due process

violations included the "disappearance" of the promotion record. Then the Senate President falsely claimed that Plaintiff had "orally" canceled a Hearing request. JA91 ¶¶110-114; JA56 ¶478; JA52-53, ¶¶455-459; JA166-168 Exhibit 9, Promotion Process Procedural Irregularities.

The composition of Plaintiff's 2001 Promotion Committee meeting was changed to exclude Jewish professors from voting. It was achieved by the unprecedented rescheduling of the meeting to late Friday afternoon and the Bronx campus. JA90¶¶ 107-109; JA56¶476. The 2002 University Tenure Review Committee admitted that the tenure process was "patently unfair to the candidates seeking tenure," which extended to the promotion process. JA91, ¶¶110-111.

The Table below illustrates process violations that permeated Plaintiff's 2003 promotion application, with procedural safeguards and candidate involvement eliminated. JA53 ¶¶456-459.

Faulty Process Violations in Plaintiff's 2003 Promotion Application



Complaint Timeline and additional information about the 2003 Promotion irregularities are in Exhibit 9, JA166-168

B. Appointment And Removal as Area Chair for 2013-2016

In 2013, the Management faculty nominated Plaintiff to be the Department Chair. The Dean and the Provost appointed her. Shortly after her appointment, Plaintiff was summarily removed without explanation to be replaced by a male. She was subjected to a hearing at which she was publicly

humiliated, even though the faculty in her department reiterated that they had

nominated her and wanted her to be treated fairly. JA82, ¶57; JA184

Fordham never honored the contract for compensating Plaintiff with the

three-year stipend and course releases due to her improper removal as Area

Chair JA81, ¶¶51-52. (Breach of contract claim JA72-73, ¶¶16-20).

Fordham arranged a Chair Termination Hearing on October 7, 2013 to

remove Plaintiff as Area Chair and replace her with Dr. Hollwitz, a male.

(Inhiation JA365) This was purportedly under Fordham Statute §4-06.50 (f)

JA248, Exhibit 18. When asked why this happened, no justification was offered.

While removing her as Chair, the Provost made derogatory, sexist statements at

the Chair Termination Hearing, held before the entire Management Systems

Area and other senior administrators. JA92 ¶¶115-121; JA57 ¶488; JA114 ¶259.

VP Crystal later denied any knowledge of her 2013 appointment as Area

Chair of Management Systems, and Fordham did not honor the contract to

compensate Plaintiff for her improper removal as Chair through that humiliating

Hearing.  JA170-172 Exhibit 10. Yet, VP Crystal attended the Hearing, and per

the provost, he was his advisor on the Statutes.

Plaintiff was appointed Area Chair fully in compliance with the Statutes. J

However, she was removed by a hearing violating the Statutes. Although

Statutes call for Chair removal under Statute 4-06.50 (f) after petition to remove

24

by 2/3 of the nominating committee, Plaintiff's Chair removal occurred after a 70% vote by her colleagues endorsing her two weeks earlier. A ¶218 JA224, Exhibit 18. See also JA169, Exhibit 10, October 27, 2017.

In a group telephone call several days before the Hearing, Dr. Hollwitz acknowledged the following:

> "I'm really disturbed by what Esther's saying. If Esther were offered the job over the weekend -- and I don't hear you, Steven [the Provost], denying that she was - then I'm not sure what we're doing…" JA360, Exhibit 29.

The Provost never denied that Dean Rapaccioli had appointed Plaintiff Chair, nor did the Dean. The Provost also discouraged Plaintiff from raising the Chair termination issues with the Senate. The Provost warned Plaintiff:

> "I'm gonna try to encourage Esther to not bring this forward to the Faculty Senate; …; it won't be positive for Esther; it won't be positive for the Area; it won't be positive for Fordham; it won't be positive for the Faculty."

See JA372, Transcript excerpt, Hearing on "*Leadership in the Management Systems Area,*" October 7, 2013.

Exhibit 29 (JA357-372) contains the meeting notices and Transcripts excerpts for:

- The October 2, 2013 four-person Conference Call between the Provost, Dean, Dr. Hollwitz, and Plaintiff (JA359-365)

- The October 7, 2013 Chair Termination Hearing, (excerpts, JA367-372)

Exhibit 10 (JA169-186) contains emails and documents on Plaintiff's removal as

Management Area Chair: Irregularities, breach of contract, and Fordham

Statutes violated: Correspondence between Plaintiff and senior administrators,

dated October 2013 to October 2017

C. Retaliation Against the Female Senators 2016

In the 2015/2016 academic year, Plaintiff had extraordinary actions taken

against her and was unfairly publicly condemned along with another female

Senator for performing their duties as Business School Senators. These activities

were undertaken with the knowledge of the Dean. JA81 ¶53

Female Senator Professor Klotz wrote on February 5, 2016 to Professors

Chatterjee and Wharton with copies to the Faculty Senate: (JA193)

> "I am very dismayed you have been misrepresenting your role…
> [Professor Solomon] raised specific concerns that the process was in
> violation of the University Statutes…It is Professor Solomon's
> responsibility as a faculty member to make sure that academic policies are
> in accordance with the University Statutes….I have copied the University
> Counsel on this email and am requesting that she stop this public
> retaliation, defamation and harassment of myself and Professor Solomon
> by you…."

Professor Klotz wrote later that day: (JA196)

> "Your and Professor Wharton's actions were not merely disrespectful,
> they were slanderous and caused irreparable harm to both Professor
> Solomon and my reputations and careers."

26

Previously on February 2, Professor Klotz wrote to the Senate President:

> "I am describing the meeting as a lynching because, in my opinion, what happened was an extrajudicial punishment by an informal group…. Elaine Crosson [legal counsel], Anastasia Coleman [EEO Officer] and I met on 1/12/16 to discuss the allegations made by Professor Wright of a hostile and toxic work environment in Gabelli in the widely distributed email dated 12/14/15. We discussed the term adverse job action with reference to EEOC regulations concerning retaliation against members of a protected group. In that discussion. I pointed out that a fairly severe adverse job action for senior faculty is damage to one's reputation…" JA198.

Another female Senator described the damage against the female Senators:

> "But the actual reputational and emotional damage to our two colleagues, even more than the statutory violations, is to my mind the most chilling aspect of this -- and ultimately the most damaging to the Senate. Who would be foolish enough to serve on the Senate … if doing so … puts your job of 20 or 30 years in peril and damages a lifetime of working relationships?" JA55 ¶466.

In the 2016 Faculty Senate incident, groups outside the Business School intervened to prevent further damage. The Fordham Faculty Senate passed its unanimous February 26, 2016 Resolution against Retaliation to protect the female Senators.

> *"Resolved, That this Faculty Senate, as guardian of the University Statutes and Faculty Handbook, supports and encourages efforts by its members to voice at meetings of the Senate concerns respecting policies and procedures inimical to the nature of academic shared governance, without fear of internal or external constraints, intimidation or retaliation."* [Italics in original] JA423, Exhibit 37 with Senate Minutes. JA56 ¶467.

The Fordham Board of Trustees also intervened after it was copied in Plaintiff's March 1, 2016 letter to the University President. That letter described the harassment, retaliation, defamatory actions, and discriminatory treatment Plaintiff had endured. JA94 ¶129; JA113 ¶256; JA188-190, Exhibit 11, March 1, 2016 letter. (¶¶ 129, 145,168-172, 256, 281; ECF 95-1, at 64-66).

Falsely accusing others violates the Fordham Code of Conduct. However, no action has been taken against others for doing so against Plaintiff. Nor were such investigations involved the professors who made 2016 false accusations against the two female Senators, for which one later apologized. Nor were the other participants investigated. JA27-29 ¶¶345-355; JA120 ¶303; JA56 ¶473

Pattern Against Other Professors:  A Similar Modus Operandi

Over time, Defendant exhibited a pattern targeting older, female, and Jewish professors. This was not prevalent with other non-protected groups. This included at least eight professors who were either older, female, Jewish, or a combination. They were similarly maltreated or forced out, using a modus operandi subsequently applied to Plaintiff. JA96 ¶¶143-146; JA120-121 ¶¶304-311; JA30-31 ¶¶364-367.

Pay Discrimination Documentary Evidence

Plaintiff's pay has been significantly lower than similarly situated males, younger or non-Jewish, or a combination.  Plaintiff and comparators' job content

28

is comparable with the same core content per the Fordham Statues, in the same
academic unit, Management, within the Business School. Plaintiff was deemed
to be one of the lowest-paid requiring "compression adjustments. According to
Fordham's data, Plaintiff earns approximately half of what her similarly situated
male colleagues earn per the table below. Particularized pay facts and supporting
documents are contained in JA70-72, ¶¶1-15; JA41-46, ¶¶400-419; JA110-112,
¶¶234-248.

The 2008 the Fordham Faculty Senate *Report of the Salary and Benefits
Task Force on Indicators of Gender Salary Equity Among Faculty Members at
Fordham University* provided statistical evidence qualifying as prima facie
evidence of disparate pay impact on female professors. Despite knowledge, the
University has not corrected the gender pay disparities. (JA143, Exhibit 5)
JA70¶4; JA80¶44; JA89 ¶¶103-104; JA110-11¶¶234-242.

Based on data provided to the Task Force in 2007-2008, women faculty at
Fordham earned 91.8% of what men earned on average. (JA148) Median
salaries indicated that women earned 89% of what men earned. 26.3% of women
faculty held the rank of full professor, compared to 40% of men. Note should be
taken that Plaintiff was twice denied full professorship under highly irregular
circumstances.

Eight years later, in 2016, the Fordham Faculty Senate committee deemed Plaintiff's pay unfairly low compared to the Business School faculty. The Committee established the pay to be "lower than the lowest salary at the lower rank," that is- lower than day one entry-level assistant professors. *Faculty Senate Meeting Minutes of March 11, 2016*. JA71 ¶¶8-10; JA44 ¶411; JA108 ¶¶223

Table 3 below illustrates the 2011-2018 Salary Comparison for Plaintiff and the eight males established as comparators jointly by Fordham with the Cravath Law Firm. (JA42, ¶402)The names of these comparators Management Professors were redacted, so it is unknown who corresponds to each number. The mutually agreed comparators are listed in JA17 ¶216 with the year each joined Fordham, their seniority: Professors Wharton 1981, Sen 1986, Hollwitz 2000 Pirson 2008, Stoner 1970s, Cole 2008, Hurley 1992, Wright 2012, Solomon 1984. JA80, ¶43.

As the chart below demonstrates, W2 data indicates that Plaintiff was paid ~55% of her male colleagues.

**Table 3: Management Systems Male Comparators Annual Earnings**

| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Average |
|---|---|---|---|---|---|---|---|---|---|
| W2 Male #1 | $156,133 | $159,335 | ---- | $148,274 | $199,718 | $203,608 | $215,802 | $235,103 | $188,282 |
| W2 Male #2 | $186,930 | $232,623 | $202,359 | $175,956 | $206,064 | $241,683 | $275,795 | $221,794 | $217,901 |
| W2 Male #3 | $365,233 | $307,573 | $393,072 | $421,491 | $335,002 | $355,067 | $312,806 | $333,592 | $352,980 |
| W2 Male #4 | $155,665 | $162,279 | $166,723 | $173,914 | $198,522 | $204,744 | $208,461 | $230,309 | $187,577 |
| W2 Male #5 | $159,004 | $197,685 | $272,810 | $258,288 | $294,150 | ---- | $213,267 | $178,662 | $224,838 |
| W2 Male #6 | $197,221 | $186,533 | $183,565 | $166,773 | $159,562 | $165,030 | $161,259 | $165,083 | $173,128 |
| W2 Male #7 | ---- | $155,251 | $244,504 | $246,703 | $245,951 | $255,366 | $202,171 | ------ | $224,991 |
| W2 Male #8 | ------ | $124,704 | $145,530 | $134,099 | $138,248 | $68,249 | $93,617 | $156,106 | $122,936 |
| Male Avg | $203,364 | $190,748 | $229,795 | $215,687 | $222,152 | $213,392 | $210,397 | $217,236 | ~$211,000 |
| W2 Solomon | $114,768 | $109,027 | $106,406 | $111,525 | $80,669 | $53,138 | $53,914 | $55,545 | $85,624 |
| Base | $105,851 | $108,901 | $111,409 | $113,880 | $116,160 | $120,571 | $122,947 | $125,564 | $115,660 |

The 2011-2018 Salary Comparison table demonstrates that the male professors' average earnings were about $211,000 based on their W2 forms. Plaintiff's average base salary was about $116,000. The compensation differential is $96,000/year. JA43 ¶403-405.

Fordham redacted the comparators' names in their limited discovery, despite Plaintiff's pro bono counsel's email that documents should be produced "without redactions, as required by the Federal Rules." "Name Redactions" are inconsistent with the February 2019 Protective Order. On December 23, 2019, Fordham conveyed their position to the Court: "The names of the comparator professors are simply superfluous" (JA43 ¶¶406-407).

There are two components to compensation at the Business School – salary and income from administrative and extra teaching assignments. Plaintiff was discriminated relative to males and younger females. JA108 ¶223; JA44 ¶¶413-414.

Compounding base salary discrepancies are inequities due to discrimination:

- the persistent denials of administrative and teaching opportunities over decades, initially described in the 2003 Memo to the Faculty Senate by older female professors (JA200-201, Exhibit 13)

- these issues were repeated in her October 27, 2017 email to Provost Freedman. (JA169, Exhibit 10; JA13, Exhibits 2)

- Improper denials of promotion in 2001 and 2003;

- Discrimination in other forms of compensation and benefits (JA72 ¶¶14-16)

For example, Plaintiff was appointed Management Area Chair for 2013-2016 with a stipend of $18,000-$20,000 per year and course releases. But she was improperly removed as Chair without explanation and replaced by a male colleague. The Dean thanked another male, Dr. Sen, for helping replace her. JA43-44 ¶¶408, 410; JA92 ¶121. Nor did Fordham fulfill her Area Chair contract.

*Yoon v. Fordham Univ. Faculty & Admin. Ret. Plan*, 2004 U.S. Dis. LEXIS 26070 (S.D.N.Y. 2004) remanded by the Second Circuit, *Yoon v. Fordham Univ. Faculty & Admin. Ret. Plan,* 263 F.3d 196 (2d Cir. 2001), involved another Management Professor at Fordham.

The District Court reviewed that professor's status and concluded after many years that he had not been terminated in compliance with the university's contractual obligations. He thus might be entitled to salary and pension contributions per ERISA.  In the current case, Order-III (SPA76) states, "Fordham's University Statutes govern Solomon's employment and create enforceable contractual rights for tenured Faculty, citing *Yoon* 2004.

In another case involving the Business School Management Department, Court records documented the discriminatory intent regarding gender pay. Dr. Marks, an older Jewish female, was an Associate Dean for Academic Affairs. She sought to transition to faculty in Management Systems upon leaving her

33

Dean's job. See *Marks v. Smith* 65 A.D.3d 911 (1st Dept. 2009). Her salary was

cut, and she was accused of "refusing to teach," and then terminated. ¶304, 30

Dr. Hollwitz, then Vice President of Academic Affairs, stated under oath

that once an administrator transitions to faculty, the practice is for her salary to

be lowered, comparable to other faculty. As the *Marks* Court noted:

> "Defendant Hollwitz … testified, without contradiction, that, as a matter
> of general practice, a Fordham administrator who transferred to the
> faculty would receive a lower salary as a faculty member than he or she
> had received as an administrator. Hollwitz further testified that Plaintiff's
> faculty salary was set at $70,000 because that amount "was somewhere in
> the middle of the distribution of Associate Professor of Management
> Systems salaries."

For a female transitioning from Associate Dean to faculty, the practice would be

a $70,000 annual salary. For male Dr. Hollwitz making an equivalent transition

in 2008, his salary per public records was $432,083 the following year. JA45-46,

¶¶416-418; JA154, Exhibit 6

<u>Comparator Professors</u>

The male tenured comparator professors in the Management Area of the

Business School are identified in JA107, ¶216, along with their seniority. The

salaries for eight of them are in Pay Table 3. The female tenured Management

comparators are listed in JA112, ¶244. Female comparators who are contract

instructors are in JA112, ¶245.

In 2017, Management Systems was subdivided into three sub-areas, LPO

("Leading People and Organizations"), Strategy-Statistics, and Operations. In

Dr. Crooker's Affidavit (JA-469), Fordham identified five LPO Professors as

Plaintiff's comparators: Drs. Stoner, Hurley, Hollwitz, Pirson, Wright. Their

comparator status is acknowledged in Dr. Hollwitz's 2019 email. JA-47, ¶429;

JA49, ¶436.

Job content is defined by Statute, "Faculty Responsibility" §4-03.01.

(JA231) Section A states: "Appointment as a faculty member is a contract for

full-time engagement in faculty responsibilities during the academic year." It

goes on to state the responsibilities in Section 1-11. The faculty work content

responsibilities consist of the core of teaching, research, and service. These

responsibilities are amplified in JA106 ¶¶210-212. These job content standards

meet the requirements of *Graham* and *Freyd* for University Professors.

All male comparators are tenured professors in the same Management

Department within the Business school and subject to the same rules per the

Statutes. All hold Ph.D. degrees or equivalent, as per the AASB accreditation

rules. They were evaluated by the Personnel Committee regarding

reappointment, tenure, and promotion and subject to the same teaching,

research, and service standards. JA106 ¶215.

Plaintiff and comparators are similarly situated under several criteria: 1)

Seniority; 2) Job responsibilities and workplace standards; 3) Number of classes

expected to teach; 4) Contracts 5) Academic publications and other job

requirements as specified in Order-I. The TAC documents how these jobs share the same "common core" tasks as in *EEOC*. "the EEOC's Compliance Manual states that "[j]ob content ... determines the equality of jobs," and "whether two jobs are substantially equal" turns on "whether the jobs have the same 'common core' of tasks." EEOC Compliance Manual § 10–IV(E)(2) (2000)." *EEOC v. Port Authority of New York & New Jersey*, 768 F.3d 247 (2d Cir. 2014).

*1. Seniority*: In JA107, ¶216, the male comparator's seniority is reflected when they joined the Area. Plaintiff joined in 1984. Dr. Hollwitz joined Management in 2007 and Fordham in 2000 as an administrator. Plaintiff has higher seniority than Dr. Pirson (by 24 yrs.), Dr. Hurley (by 19 yrs.), Dr. Hong (by 30 yrs.), etc. The Court concluded that Dr. Hollwitz had higher seniority, stating that "Solomon alleges ... that Hollwitz was a more senior professor than she was…" (SPA 22, Dkt. 69) Plaintiff alleged the contrary.

*2. Job Responsibilities and Personnel Po*licies: The job content and faculty responsibilities are described in JA106, ¶¶210-214, and the Statute §4-03.01. (JA 224, Statutes) Work content responsibilities are teaching research, and service. The statutes govern her job and explain the common job core and the aspects she shares with the comparators.

*3. Workplace and Disciplinary Standards*: The comparators are subject to the same performance evaluation and discipline standards defined by the

Fordham Statutes. (JA253, Article Six, Discipline, Code of Conduct; JA328. Academic Due Process, Discipline). "[E]mployees are comparable where they are (1) "subject to the same performance evaluation and discipline standards" and (2) "engaged in comparable conduct." *Graham v. Long Island R*R, 230 F.3d 34 (2d Cir. 2000). The Business School faculty are also bound by the Business School Bylaws, providing specific procedures for committees and governance.

*4. Number of Classes*: Teaching load responsibilities are described in Statutes §4-03.02 (JA231) as modified by Senate Minutes. The maximum faculty teaching load is no more than five courses per year, which can be reduced through Course releases. JA106 ¶¶213-214

*5. Contracts*: The contract of Plaintiff and comparators (tenured faculty) is defined in Statute §4-05.04, granted by the Board of Trustees. JA105 ¶¶ 205-208; JA224 Exhibit 18; JA329, Exhibit 25.

Previous Administrator Job Does Not Disqualify Faculty as Comparator

The Fordham Statutes make clear that Area Chairs are faculty, not administrators. The Statutes define faculty in §4-01.02 (JA227) and distinguish faculty from administrative appointments.

Area Chairs, Directorships, and Senators are part of the job content of faculty, not an additional obligation beyond that role. "Faculty Role in University Governance" Statutes §4-06.01. JA244, Exhibit 18; JA 107 ¶219.

Although not the only Plaintiff comparators, Drs. Hollwitz and Pirson were Area Chairs for brief periods. Dr. Hollwitz was Academic Vice President before he became faculty in 2008. That Dr. Hollwitz left his administrator job to become faculty does not disqualify him as a comparator. The current job content, not the previous one, should be relevant.

Plaintiff was a Senator, unlike Dr. Hollwitz. Plaintiff alleged that she was removed from her appointment as Area Chair due to discrimination.

Plaintiff performs substantially comparable, if not more complex, work than her higher-paid male colleagues. She has the highest seniority in her Area, a broad background, experience and training in clinical and industrial psychology, years of applying process management innovations in business, and a mathematically oriented research methodology. JA46, ¶420

Discriminatory Intent Examples

As seen in the previous sections, discriminatory intent and disparate treatment have permeated Plaintiff's employment at Fordham.

Discriminatory Application of Course Prerequisites in 2018

Discriminatory graduate course prerequisites were applied to Plaintiff in 2018. But the males subsequently removed them to enable student enrollment in their graduate electives so *their courses* would not be canceled. JA50, ¶¶443-445.

38

The Prelude to the Demotion/ Transfer: Hostile Actions After March 2017

In June 2017, in their efforts to deny Plaintiff the Chair and appoint Dr. Pirson, the Administration introduced new incorrect rules and procedures about who could serve as a Chair, some inconsistent with the University's governing documents. These rules were to preclude Plaintiff from voting and from becoming Chair again. JA87 ¶85

In July 2017, Plaintiff asked for an unpaid leave of absence. Initially, she was denied leave for reasons inconsistent with governing policy, while a younger, non-tenured, non-Jewish faculty was granted leave. After Plaintiff refused the phased retirement recommended by Dr. Pirson in exchange for the leave, the leave was eventually granted. But she had to perform academic functions not normally required of faculty on unpaid leave per the Provost's Office. JA87 ¶86

In August 2017, Plaintiff attended a conference but was not invited to the Fordham-sponsored reception. In September 2017, she received an email from her supervisor who began, "in case you come back." In October 2017, she presented a paper at the Strategic Management Society held in Houston. Unlike younger faculty, her expenses were not fully covered. On December 17, 2017, Plaintiff was denied any summer 2018 funding for her research proposal: "CEO

Perceptions and Values Structure: Leader Integrity in Corporate Governance," based on 960 responses by Chief Executive Officers. JA88-89 ¶¶87-89, 93.

Exclusion from Recruiting Meeting in 2019

Plaintiff was excluded from recruiting meetings on October 10, 2019. Area males relied on secret meetings from which they excluded Plaintiff. Then they excluded her from recruiting interviews for tenure track faculty. JA50-51 ¶446

Female Professors and Racist, Anti-Semitic Incident in 2018

A student reported a racist, anti-Semitic, and sexist incident against two female professors in 2018. Fordham Administrators prohibited Plaintiff from responding to her female undergraduate student who reported her fellow students' "borderline sexual harassment against you as professors" to her two female professors, one black, the other Jewish. Demeaning cartoons and humiliating, racist comments were distributed with "lewd social media content posted."

Fordham has never sent Plaintiff any further information about the process or outcome of any investigation, not even whether they conducted any investigation, despite requests. JA53-54, ¶¶460-462; Exhibit 16, August 23, 2018 Student Email, JA210 (with redactions)

Fordham Acknowledges Duty to Investigate Discrimination Claims

Dr. Thomas Wright, the Distinguished Larkin Management Professor, described to the Provost in their December 2015 email exchange the discrimination he faced in his exclusion from most graduate teaching, an apparent effort to force him out.

He wrote that the "School of Business has become what organizational behavior scholars describe as a hostile and toxic work environment." Dr. Wright described violations of his contract; "unethical business practices;" "increasingly demoralized Gabelli campus climate;" "unequal pay for the *same* work" [for senior faculty like Plaintiff], "unethical behavior," and foretold the harm to come "to too many members of the Fordham Gabelli community." JA30 ¶¶366

The Provost stated: "the University has an obligation, under the law, to investigate such [discrimination] claims," which he referred ''to the University's Counsel…" But with Plaintiff, investigations *should* have followed but did not. JA109 ¶227; JA56, ¶479; JA30 ¶¶364-365; JA374-378 Exhibit 30.


ARGUMENT

POINT I: PLAINTIFF PLAUSIBLY ALLEGES A
DISCRIMINATION CLAIM

To survive a motion to dismiss a Title VII discrimination claim, a plaintiff must show "(1) that she is a member of a protected class, (2) that she was

qualified for the position she sought, (3) that she suffered an adverse employment action, and (4) can sustain a *minimal* burden of showing facts suggesting an inference of discriminatory motivation, then she has satisfied the prima facie requirements. A plaintiff need only allege facts that give "plausible support to a minimal inference of discriminatory motivation." *Littlejohn v. City of N.Y.*, 795 F.3d 295, 311 (2d Cir. 2015). Title IX standards for intentional gender-based discrimination against a faculty member mirror those under Title VII. *Vengalattore v. Cornell Univ.,* 36 F.4th 87 (2d Cir. 2022). Age discrimination claims under ADEA require plaintiff to plausibly allege that "an employer took adverse action 'because of' age [and] that age was the 'reason' that the employer decided to act." *Lively v. WAFRA Inv. Advisory Grp., Inc*., 6 F.4th 293, 303 (2d Cir. 2021).

The discrimination claims are brought under Title VII, Title IX, ADEA, NYCHRL, and NYCHRL. The Complaint meets the pleading standard for the above claims.  Plaintiff belongs to protected classes and is qualified for her tenured professor position. She was subject to adverse actions; the facts demonstrate intentional discrimination and are more than adequately pleaded.

<u>Adverse Actions</u>

The adverse actions include: 1) Plaintiff's demotion and transfer, as of Spring 2018 found by the Court as per *Vega v. Hempstead Union Free Sch.*

*Dist.,* 801 F.3d 72 (2d Cir. 2015) SPA20-21; 2) The persistence of the demotion and adverse actions the following semesters, reflecting the intention to force her out in constructive discharge; 3) the disparate pay, about half of Plaintiff's male comparator professors; 4) the workplace sabotage,  and; 5) the termination, the ultimate adverse action. Since Fordham took these adverse actions during federal litigation, they are retaliatory. The adverse actions are sufficiently alleged throughout the complaint and summarized in Table 1.

Discriminatory intent

Discriminatory intent can be inferred by the repeated failures to investigate despite Plaintiff's multiple pleas to the President, the EEOC officer, and senior administration. These unanswered requests for investigations and hearings —-before and during the federal case ---meet the discriminatory intent standard for Title VII and the deliberate indifference standard required for Title IX, where the university's intentional violations disregarded the procedures set out in its written policies. *Vengalattore* at105.

Plaintiff alleged facts that give "plausible support to a minimal inference of discriminatory motivation" (*Littlejohn* at 310), including that she was "replaced by someone outside [her] protected class" when she was demoted to the Bronx undergraduate campus. *Id*. at 313. That is sufficient on a motion to dismiss.

Recent Second Circuit decisions highlight the significance of violating University due process, indicating discriminatory intent. See *Menaker v. Hofstra Univ.,* 935 F.3d 20 (2d Cir. 2019) and *Vengalattore supra*. The extraordinary adverse action of terminating tenured faculty without cause or due process here exceeds the *Vengalattore* standards for discriminatory intent.

Even in actions involving at-will university employees with fewer protections than Plaintiff, a tenured faculty, the Second Circuit has emphasized the importance of adhering to procedural safeguards:

> [O]nce a university has promised procedural protections to employees, the disregard or abuse of those procedures may raise an inference of bias ... Apart from an inference of bias, a university's disregard of promised procedural protections may also give rise to claims for breach of contract or for violations of state law guarantees of procedural or substantive fairness." *Menaker v*, 935 F.3d at 33.

Fordham's "departures from procedural regularity" can "support an inference of impermissible discrimination." *Stern v. Trustees of Columbia Univ*., 131 F.3d 305, 313 (2d Cir. 1997). Yet, the District Court sought to minimize or explain away these irregularities.

Breach of their Fiduciary Duties

Fordham compounded the misconduct by covering up a tenured faculty's secret termination by misrepresenting those actions as unpaid leaves, filing contradictory reports to different federal agencies, and calling these actions "customary." Falsification by administrators of COBRA-ERISA and IRS rules

to deprive the Plaintiff beneficiary is a breach of their fiduciary duties. *Varity Corp. v. Howe,* 516 U.S. 489 (1996); *In re DeRogatis,* 904 F.3d 174 (2d Cir. 2018).

Further support of discriminatory intent is the evidence of disparate treatment; discriminatory animus such as sex stereotyping, and the failure to investigate complaints of discrimination, procedural irregularities, and gender-based disparate pay."[A]n employer's noncompliance with its own affirmative action plan may be probative of discriminatory intent.… A reasonable jury could find that [the] failure to investigate this complaint pursuant to [the] discrimination policy was evidence that he was covering up discriminatory treatment." *Collins v. Cohen Pontani Lieberman Pavane,* 2008 U.S. Dist. LEXIS 58047, 35 (S.D.N.Y. 2008). In this case, there were multiple instances of failure to investigate, even when the Provost stated it was his legal obligation. For example, the false charges repeated three times against Plaintiff, in 2016 with female Senator Dr. Klotz, in 2017 with the Dean's false Code of Conduct charges, and in 2019 post-termination, were part of a pattern against other protected class professors by the same group.

Constructive Discharge

To state a claim for constructive discharge, an employee must allege facts indicating (1) "the employer's intent to create an intolerable environment" and

45

(2) "work conditions so intolerable that [a reasonable person] would have felt compelled to resign." *Shultz v. Congregation Shearith Israel of N.Y*, 867 F.3d 298, 308 (2d Cir. 2017); accord *Green v. Brennan,* 136 S. Ct. 1769, 1776 (2016). A termination "may consist of either the employer's actual termination of the plaintiff's employment or the existence of intolerable conditions, attributable to the employer, amounting to a 'constructive' discharge." *Green v. Town of East Haven,* 952 F.3d 394, 404 (2d Cir. 2020) In *Green,* the Court overturned summary judgment, concluding that "the retirement was not voluntary but was coerced by the threat of likely termination. The same should apply here as well, where it is even more severe.

Where the plaintiff's forced unpaid leaves are coerced by the employer's deliberate actions creating intolerable working conditions, they can be viewed as equivalent to resignation in a post-termination context or as a suspension without pay, a retaliatory transfer (similar to also *Burlington N & Santa Fe Ry. v. White,* 548 U.S. 53 (2006) "Indefinite suspension without pay") which could deter the reasonable worker. They can be contrasted with actual termination — always a product of the company — with constructive discharge, which involves "an employee's decision to leave and precipitating conduct." *Penn. State Police v. Suders*, 542 U.S. 129 (2004). Here, the persistence in the demotion and

46

discriminatory assignments persistently, and within the overall context, satisfy the requirement of employer intent which is the focus of the inquiry.

Fordham repeated this every semester, forcing Plaintiff into unpaid leaves, demonstrating the intentionality for constructive discharge. *Petrosino v. Bell Atl*. 385 F.3d 210 (2d Cir. 2004). After the March 2020 Court order (SPA 2), Fordham had direct knowledge of violating the law. Fordham forced Plaintiff to request unpaid leaves, which deprived her of the ability to teach as a graduate professor and sacrificed her faculty salary. It involves reputational damage and stigmatization for a professor. Fordham's actions led to her forced unpaid leaves in 2019, 2020, 2021, and onwards. Fordham's actions made it clear that Plaintiff would never be allowed to go back to being a graduate professor or treated in a non-discriminatory way. These actions amount to constructive discharge, as the employer intended to force Plaintiff out of the workplace, precluding her from ever teaching in a manner consistent with her tenure contract as a graduate professor with the highest seniority in the Area.

This treatment was contrary to the men who replaced her in her graduate teaching and worse than the treatment of younger females (age-plus-gender in violation of Title VII and the ADEA). *Gorzynski v. JetBlue Airways Corp*., 596 F.3d 93, (2d Cir 2010).

Fordham made Plaintiff's working conditions "so difficult or unpleasant that a reasonable person in [her] shoes would have felt compelled to resign." *Chertkova v. Connecticut Gen. Life Ins. Co.,* 92 F.3d 81, 89 (2d Cir. 1996)

Plaintiff was forced to choose between persistent demotion and discriminatory assignments or request unpaid leave and sacrifice her salary "until matters are resolved." But Fordham indicated its intention never to resolve them and escalate the pressure to force her out. The dilemma is in line with *Green v Town of E. Haven,* 952 F.3d 394 (2d Cir. 2020). The multiple false conduct charges against her were "held over her like a sword of Damocles a threat of immediate termination." *Chertkova* 92 F.3d at 90.

The District Court trivialized the actions against Plaintiff, calling them "scheduling" issues. But they were serious adverse actions, including demotion, the deliberate creation of intolerable working conditions, and workplace sabotage to force her out. Her male and younger female comparators replaced her in graduate courses, although she had the highest seniority and experience. The facts here meet the criteria for constructive discharge:

> (l) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7)

offers of early retirement or continued employment on terms less

favorable than the employee's former status."

*Newbury v. City of Windcrest*, 991 F.3d 67, 677 (5th Cir. 2021). *Logan v.*

*Denny's, Inc*., 259 F.3d 558, 568 (6th Cir. 2001) *Eaves v. Eye Ctrs. of Tenn*.,

2020 U.S. Dist. LEXIS (M.D. Tenn. 2020)

Constructive discharge claims are to be analyzed by the *McDonnell*

*Douglas* burden-shifting framework. They are fact-intensive, going to the

employer's intentions. But Plaintiff's claim was dismissed as a matter of law

based on the incorrect dismissal of the hostile work environment.

The district court relied on the summary judgment case *Pennsylvania*

*State Police v. Suders, supra*, which extended Faragher/Ellerth to compound

"hostile-environment constructive discharge claims," unlike here, where

constructive discharge is independent. The present issues of material fact make

them less amenable, even to summary judgment (See *Green, Chertkova, and*

*Shultz*)

Termination - Notice Itself is Adverse Action

A *notice of termination* is itself an adverse action. "This 'notice rule' as

the Supreme Court described…means that the claim is actionable on the date the

employee is noticed, not on the last day of his employment.'" *Green v. Brennan*,

136 S. Ct. 1769, 1782 (2016). *See Shultz,* 867 F.3d at 305.

Under this rule, the first termination occurred on April 12, 2019. (JA317).

Fordham pretended nothing happened, but that termination was followed by the final one on February 1, 2020 (JA318). Both notices were adverse actions. These were accompanied by employer actions amounting to constructive discharge. Defendant disguised them under the pretense of "voluntary" unpaid leave, although coercing her. After the Notice, even if the termination is rescinded, unlike here, the employer's motives and bona fides in subsequent actions are suspect and jury questions.

"Because such issues are fact-intensive, we cannot and do not attempt at this stage of the litigation how they may play out in this case." The employer's motives "are questions for the finder of fact." Regarding rescission of termination, "Whether motivated by a genuine change of heart, or by a belated recognition of the possible legal consequences of its actions." See *Schultz* at 306.

Contrary to *Shultz*, the February 1 termination was never rescinded. The Court concluded otherwise, but Fordham provided no such documentation of rescinding from either the IRS or the Department of Labor. *See also Delaware State College v. Ricks,* 449 U.S. 250, 258 (1980) (the "proper focus is upon the time of the discriminatory acts, not upon the time at which the consequences of the acts became most painful"). Under *Ricks*, "The limitations period commences at 'the time the [termination] decision was made and communicated

to the employee, even when the date of termination is later than the date of notification." (*Id*.)*.*

POINT II: PLAINTIFF PLAUSIBLY ASSERTS RETALIATION CLAIMS

To survive a motion to dismiss for a retaliation claim, "the plaintiff must plausibly allege that: (1) defendants discriminated—or took an adverse employment action—against him, (2) because he has opposed any unlawful employment practice." *Vega.,* 801 F.3d at 90. "The allegations in the complaint need only give plausible support to the reduced prima facie requirements that arise under McDonnell Douglas in the initial phase of a Title VII litigation." *Littlejohn*, 795 F.3d at 316. In the retaliation context "[A]n adverse employment action is any action that could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Id*. at 90. See also *Burlington N & Santa Fe Ry. v. White*, 548 U.S. 53, 68, (2006). The same standards apply with ADEA, which requires "that the adverse action would not have occurred in the absence of a retaliatory motive." *Lively* 6 F.4th at 307. Similarly, "the elements of a retaliation claim based on Title IX equal protection violation mirror those under Title VII." *Vega*, 801 F.3d at 91.

The harm element of retaliation is "whether the [alleged adverse action] to which [the plaintiff] was subjected could well have dissuaded a reasonable

employee in his position from complaining of unlawful discrimination." *Davis-Garett v. Urb. Outfitters, Inc.,* 921 F.3d 30, 43-44 (2d Cir. 2019). For both retaliation and a hostile environment, earlier acts should be included.

Waves of Harmful Retaliation Would Dissuade a Reasonable Faculty

The retaliation claims under federal, state, and city law are adverse employment actions that could dissuade a reasonable faculty from making or supporting a charge of discrimination. Plaintiff satisfies the *Duplan* causation standard for retaliation at the pleadings stage by her allegations that "each of the adverse actions" taken by defendants "occurred against a backdrop of continuing antagonism and frustration of [the plaintiff's] professional ambitions." *Duplan v. City of New York*, 888 F.3d 612, 626 (2d Cir. 2018).

The recent actions against the professor during the federal lawsuit should be viewed holistically within a pattern of actions over the years by the same group as alleged. Consideration of the pattern should include the 2016 actions necessitating the unanimous Faculty Senate Antiretaliation Resolution to protect the two female Business School Senators and the pattern of targeting other protected class professors as part of a retaliation pattern using similar methods by the same group. Part of the same unlawful pattern, these earlier retaliations should have been included.

Escalating Retaliations

After Plaintiff filed her complaints in federal court, Fordham took harsh and escalating measures against her. As seen in Table 1 above, each alone and certainly in the aggregate meet the retaliation standard: "actions had to be harmful to the point that they could well dissuade a reasonable worker [a tenured faculty] from making or supporting a charge of discrimination." *Le Grand v. Walmart Stores East LP,* 779 Fed. Appx. 779, 783 (2d Cir. 2019). The District Court's decision does not mention most retaliatory acts, *e.g.*, in Table 1.

Plaintiff alleges facts surrounding multiple incidents that could rise to the level of actionable retaliation as they were caused by her protected activity, each of which would suffice to sustain her action. Each discrete adverse employment action driven by retaliatory animus constitutes a separate "unlawful employment practice" that could give rise to a separate claim, *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114, (2002). In assessing whether conduct constitutes adverse employment action, the Court considers the alleged acts of retaliation "both separately and in the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable." *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010)

Table 1 in the facts section summarizes the Retaliatory Adverse Actions during the Federal Litigation from 2018 to the present, depicting the escalating retaliations and temporal proximities.

On the left column A is the repeated adverse actions starting with Spring 2018, persisting every semester, despite the pleas to the President, documenting the "deliberate indifference" for Title IX and intentionality for constructive discharge. The right column C depicts the terminations.

The first secret termination #1 occurred on April 12, 2019 , within a month following the March 13, 2019 Amended complaint. The second and final termination #2 of February 1, 2020 followed the November 2019 Subpoenas. It occurred after the January 2, 2020 letter to the President describing the discrimination and requesting a hearing and due process, and after Fordham's warning they would cut all her faculty benefits as tenured faculty.

Facts Causally Connecting Retaliatory Acts to Plaintiff's Protected Activity.

Temporal Proximity- Examples of sequences are as follows:

- October 27, 2017 Complaint to Provost, Dean, and Fordham Vice Presidents Regarding Ongoing Discrimination and Retaliation JA-073
- Nov. 30, 2017 Complaint of Discrimination and Teaching assignments to the Provost, the Dean, and the Fordham Vice President
- Nov. 30, 2017 - Dr. Pirson Threat to go to University counsel

Damaging Teaching Assignments from Dean's office

- Dec. 1, 2017, Escalating Discrimination -Graduate course cancellation
- Dec. 17, 2017, Denial Summer Faculty Research Support Application for Summer
- Protected Action: Dec 18, 2017 Complaint to Fordham EEOC
- Dec. 18, 2017, Dean's email regarding Code of Conduct violations

2019 First Termination Timeline: JA35 ¶380.

- March 13, 2019 Amended Complaint
- April 12, 2019 Notice of Termination (Secretly without cause, notice, or due process).
- April 25, 2019 Dean Rapaccioli sent Plaintiff Post-termination False charges, copies to senior administration, attorneys
- May 3, 2019 Plaintiff disputed False charges
- May 24, Dean notified Plaintiff, authorizing unpaid leave. The Dean first presented, as "customary," a supposed policy of removing faculty health benefits during unpaid leaves. There was no such policy.  (Exhibit 31 Spring 2019 Correspondence)

February 1, 2020 Second Termination Timeline:

~1 month after Complaint to President requesting Due Process
~2 months after Service of Subpoenas, Amended Complaint
3 days after the Court Hearing, authorization for Plaintiff's Motion to Compel Discovery

- January 2, 2020 Plaintiff Letter to Fordham President, requesting Hearing and Due Process
- January 29, 2020 Court Hearing Requesting Motion to Compel. *SA-510-544 and Order authorizing motion*

- February 1, 2020 Fordham Termination Notice: COBRA/ERISA regulated by IRS and DOL.

<u>Post-termination Retalations</u>

- Letter to President requesting reinstatement to graduate, having been assigned three elementary undergraduate
- Workplace sabotage- Plaintiff was cut off without notice from Blackboard and lost access to her course materials and students.

While retaliatory acts should be considered in the aggregate, the District Court excluded a series of acts before and during 2020, only to mention the Spring cut of health benefits in relation to unpaid leaves. Actions depicted in Table I were excluded from consideration as retaliations. The Court made a finding that Plaintiff remains a tenured faculty without allowing discovery.  The Orders also exclude context and the pattern against Plaintiff for years by the same group, under *Duplan.* Where there are allegations that multiple supervisors "collectively and persistently" act to thwart the plaintiff's professional ambitions, such allegations adequately establish the existence of retaliatory employment acts. *Duplan*, 888 F.3d at 626; See also *Dodd v City University of New York*, 2018 U.S. Dist. LEXIS 153087.  Nor did the Court consider the cover-up to deny accountability and contradictions among defenses by Fordham administrators in their emails cited in the Orders, which are evidence of pretext.

Facts regarding claims of "Retaliation for Filing EEOC Complaints" are contained in JA73-74 ¶¶21-31. Facts regarding claims of "Retaliation

Subsequent to May 24, 2018 Filing of Federal Complaint" are in JA102-103, ¶¶186-199.

The District Court did not address the retaliatory actions in Table 1 but focused on a narrow claim of reduced health benefits "payment of premiums." That is inconsistent with Plaintiff's claims, including her demotion and discriminatory transfer every semester, and the termination, which were not properly addressed. They were dismissed by findings of fact that "Solomon's status as tenured faculty has not changed." SPA128.

Using summary judgment standards, the Court referenced the substantive discrimination rather than the retaliation standard per *Burlington* and incorrectly required, in a motion to dismiss for ADEA retaliation, proof of but-for causation applicable at summary judgment or trial rather than at this early stage of litigation. The rule of but-for causation was not applicable to determine whether he established a prima facie case of retaliation -- it applies when a plaintiff is rebutting an employer's neutral reason for an adverse employment action." *Rasmy v. Marriott Int'l Inc*., 952 F.3d 379 (2d Cir 2020)

<u>FMLA Retaliation</u>

The District Court relied on an administrator as a "witness" about unwritten non-existing "policies" used to retaliate against Plaintiff post-FMLA leave and disputed by Plaintiff in their correspondence. (JA212-222, Exhibit

17). The Court did not consider that Reply's web link on Fordham FMLA policy contradicts Dean Borun's statements, as does VP Crooker's testimony to the Faculty Senate. Neither includes those punitive post-FMLA leave rules for faculty.

## POINT III: PLAINTIFF PLAUSIBLY ASSERTS A HOSTILE WORK ENVIRONMENT CLAIM

Plaintiff's allegations meet the elements of a hostile work environment. The allegations support that Fordham supervisors persistently discriminated against Plaintiff (and other women), refused to investigate, and did nothing to provide any remedy, although on notice for years.

The facts illustrate the discriminatory bias against her and the substrate for her hostile work environment claims. These actions include the terminations, the false charges, the multiple derogatory statements against her by Fordham decision-makers, her demotion from the MBA program, the repeated retaliatory adverse class schedules, the repeated exclusions from meetings, the secrecy, the discrepancies in pay from the males and younger females, her promotion denials with their concomitant procedural irregularities, her removal as Area Chair, the unprecedented two campus Chair Removal Hearing, the intervention by the Board of Trustees to prevent the Business School taking further action against the women Faculty Senators, the action by the Faculty Senate to pass a

resolution to attempt to protect those women, the secret removal of her healthcare twice, only returned after the intervention of the Fordham corporate lawyer, the permanent removal of her healthcare when she refused to accede what this Court later found to be an adverse action schedule, the veiled threat to fire her if she did not agree to the knowingly illegal schedule in May, 2020, her removal from *faculty* (to only *student*) access to teaching materials, the exclusion from special courses, the remarks by other faculty about the toxic hostile environment among others are continuing violations.

Plaintiff endured this hostile work environment for decades, with multiple separate acts constituting continuing violations. The acts against Plaintiff before the 300-day deadline are not time-barred. A "charge alleging a hostile work environment claim . . . will not be time-barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." *Davis-Garrett*, 921 F.3d at 42. "[E]vidence of earlier promotion denials may constitute relevant 'background evidence in support of a timely claim.'" AMTRAK v. *Morgan,* 536 U.S. 101, 113 (2002). The entire pattern of undermining Plaintiff's career with milestones in the 2013 Area Chair episode and 2016 faculty senate episode should also be considered.

> "Whether a particular work environment is objectively hostile is
> necessarily a fact-intensive inquiry." The totality of the circumstances

should be reviewed: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is threatening and humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance." *Patane*, 508 F.3d at 113.

The work environment at Fordham needs to be viewed from the perspective of a professor in an academic setting. Other professors at Fordham experienced the same hostile environment, suffered from it, and some commented on it. These professors include Drs. Wright, Klotz, Weiss, Zeleny, Hessel, Marks, Orsini, and a student who reported the harassment of Plaintiff.

"Stray" remarks need to be taken in context and may have an "ominous significance." That is the situation here. When "other indicia of discrimination are properly presented See *Lenzi v. Systemax, Inc*., 944 F.3d 97 (2d Cir. 2019) ("evidence suggesting that she was paid below the market rate for her position while similarly situated men were paid above the market rate"), the remarks can no longer be deemed 'stray.'"

Plaintiff's allegations include multiple instances where decision-makers made derogatory comments and took egregious public actions against her alone and/or with other older females that diminished her status and authority in front of colleagues and subordinates. This conduct can "contribute to creation of a hostile work environment." *Gregory v. Daly*, 243 F.3d 687xxxx (2d Cir. 2001). There were also instances where her supervisors "act[ed] on the basis of a belief that woman cannot be aggressive, or that she must not be." *Collins* at 34.

60

A detailed analysis of the multiple derogatory statements and their intersection with the hostile work environment and their discriminatory animus is included in Dkt. 80, at 17-21; *Plaintiff's Memorandum of Law Opposing Defendant's Motion to Dismiss the Second Amended Complaint*.

The record also indicates the multiple requests to senior administration to intervene and stop the retaliation, such as in the letters to the president and requests for a hearing—that were unsuccessful.  These multiple failures to investigate preclude Fordham from raising the *Faragher-Ellerth* defense against retaliation.

## POINT IV: PLAINTIFF PLAUSIBLY ALLEGES THE PAY DISCRIMINATION CLAIMS

The EPA prohibits employers from paying an employee at a rate less than that paid to employees of the opposite sex for equal work, and it "prescribes a form of strict liability: Once the disparity in pay between substantially similar jobs is demonstrated, the burden shifts to the defendant to prove that a 'factor other than sex' is responsible for the differential. If the defendant fails, the plaintiff wins. The plaintiff is not required to prove discriminatory intent on the part of the defendant." *Miranda v. B & B Cash Grocery Store, Inc.,* 975 F.2d 1518, 1533 (11th Cir. 1992).

When Congress enacted the EPA, its purpose was "to remedy what was perceived to be a serious and endemic problem of employment discrimination in private industry-the fact that the wage structure in many segments of American industry has been based on an ancient but outmoded belief that a man, because of his role in society, should be paid more than a woman even though his duties are the same." *Corning Glass Works v. Brennan*, 417 U.S. 188 195 (1974)

Plaintiff exceeds the standards. Overturning a dismissal in a pro se case, the Second Circuit in *Chepak v. Metro. Hosp.*, 555 F. App'x 74 (2d Cir. 2014), reiterated that "When applying these standards to pro se complaints, we review such complaints with "special solicitude," interpreting them to raise the "strongest [claims] that they suggest." *Id*. at 76. Regarding job content for EPA purposes the Second Circuit ruled that "even if properly considered…the job descriptions at most raise issues of fact, and do not, by themselves, provide a basis for dismissing Chepak's claims." In that case, this Court held that, given her status, the allegation that Plaintiff was required to do the same job for less pay as her male predecessors was sufficient for a pro se plaintiff. "Nor must the plaintiff allege facts sufficient to defeat summary judgment." *Id*. at 76.

Here, Plaintiff has specific allegations with voluminous documentation and pay comparisons with males indicating that she is paid approximately 50% of the comparable professors. Plaintiff has provided documentation from many

sources, including the 2008 Senate Report on pay discrimination of female Professors uncorrected to date and 2016 Faculty conclusions based on a comparison of her salary to other professors in the Business School.

Plaintiff also provided the relevant sections of the Fordham Statutes that give objective indicators for workplace and discipline standards. That meets the comparator standard in *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000). (inference of discrimination could be drawn from evidence that the plaintiff was treated "less favorably than a similarly situated employee outside [her] protected group"); s*ee also Lenzi v. Systemax, Inc.*, 2015 U.S. Dist. LEXIS 145479 at 10 (E.D.N.Y. 2015) ("the fact-specific nature of [EPA] claims, and the general impropriety of dismissing them at the pleadings stage"); *Xanthakos v. City Univ. of N.Y.*, 2020 U.S. Dist. LEXIS 153272, at 11 (S.D.N.Y. 2020) ("Although Defendants argue that Plaintiff mistakenly compares herself to men with different job descriptions or higher titles, the jobs in question need not be identical in order to establish an EPA violation. ….In sum, Plaintiff's allegations that she was paid less than her male colleagues for doing equal, if not more complex, work are sufficient to state a plausible EPA claim"); *Kassman v. KPMG LLP*, 925 F. Supp. 2d 453, 471 (S.D.N.Y. 2013) (plaintiff adequately stated an EPA claim by identifying a higher-earning male comparator and asserting that his "qualifications, experience, and responsibilities were no

greater" than hers); *Lavin-McEleney v. Marist Coll.*, 239 F.3d 476, 480 (2d Cir. 2001) (a plaintiff "need not demonstrate that her job is identical to a higher-paid position, but only must show that the two positions are 'substantially equal' in skill, effort, and responsibility").

The comparators are all professors in Management Systems area, and younger male management professors (with names redacted) are all paid higher than Plaintiff. Yet, she also had the highest seniority than most. Relative to the two professors the Court focused on, Drs. Hollwitz and Pirson, Plaintiff has higher seniority than both.

In the new sections on comparators responsive to the Order-I (SPA22-23) such as JA46-40, ¶¶420-440, along with the previous comparator facts, Plaintiff fulfills the criteria enunciated by the Second Circuit, specifically regarding University Professors consistent with Freyd and the AAUP Amicus Curiae Brief submitted to the District Court.

Plaintiff sought to address comparator information in her March 17, 2020 outstanding Motion to Compel Discovery and Memorandum (Doc 70). It aimed to compel compliance with the January 2019 document requests without the redactions which impede pay. February 14, 2019 Stipulation and Protective Order in this case (Doc 24).

"[W]hether two positions are 'substantially equal' for [EPA] purposes is a question for the jury" and that a plaintiff "need not demonstrate

that her job is identical to a higher-paid position, but only must show that the two positions are 'substantially equal' in skill, effort, and responsibility." *Lavin-McEleney,* 239 F.3d at 480;

*Freyd v. Univ. of Or.* 990 F.3d 1211 (9th Cir. 2021), a gender pay discrimination case brought by a female university professor, helped clarify the national comparator standard for university professors when evaluating "equal work." In *Corning Glass Works,* 417 U.S. at 202 the Supreme Court specified that the meaning of "equal work" for the Equal Pay Act should be in "the context of the relevant 'industry standards. Plaintiff is a female university professor, and her case needs to be interpreted in the context of the Academic Profession.

*Freyd* incorporated the input of the American Association of University Professors, *Amicus Curiae Brief in Support of Plaintiff-Appellant in Freyd* (Dkt. 97, at 17), the national organization representing the profession. Fordham University incorporates AAUP principles on tenure and academic freedom in its Statutes (see Exhibit 25, Dkt. 95-2, at 16-17). The *Freyd* standards should be applicable here as the positions of comparators who are tenured faculty in the same Business School, within the same Management department of the same University, perform comparable jobs involving faculty responsibilities. The core work shared by the Fordham professors consisting of "teaching, research, and service" is pleaded by

65

reference to the Statutes as required and is consistent with the *Freyd* ruling and the AAUP guidelines.

The post-*Freyd* implications are that Plaintiff sufficiently alleged that the Fordham professors are comparators not only at the motion to dismiss stage but even at the summary judgment state as in the *Freyd* appeal: "On summary judgment, a reasonable jury could find that two positions share a common core of tasks and do substantially equal work if the evidence is 'not so one-sided as to mandate [a] conclusion as a matter of law.'"

As stated in the AAUP Brief, Universities would like to dismiss every case – as Fordham tries here. Under such tactics, no gender discrimination pay claims could ever be raised in universities. "An employer may not 'escape the Act's reach by drawing overly fine distinctions in the tasks at issue,'" as Fordham has done so far. (*Freyd* at 20). The comparisons should be between positions, not individuals.

In *Freyd,* the plaintiff raised disputed issues of material fact in her Equal Pay suit because she showed that she and comparator male professors performed substantially equal or comparable work since all of the professors in the department conducted research, taught classes, advised students, and served on committees. These are the issues that Plaintiff documented in detail about the content of their jobs in the same core areas, by specific reference to the

university statutes and other allegations – and this was without full discovery. *Freyd* supports Plaintiff's case.

"On more than one occasion this Court has indicated that questions regarding the equivalence of two positions pursuant to an EPA claim are best left to the trier of fact. ---"This Court has previously determined that defendants face a heavy burden in establishing an affirmative defense to an EPA claim" *Jamilik v. Yale Univ*., 362 F. App'x 148, 150 (2d Cir. 2009). In determining whether there are genuine issues of material fact to be tried, "the district court may not properly consider the record in piecemeal fashion, trusting innocent explanations for individual strands of evidence; rather, it must 'review all of the evidence in the record.'" Id. (quoting *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).

Plaintiff Alleges a Disparate Pay Claim under Title VII, Title IX, ADEA, NY Laws, and APEA

To allege a *prima facie* case of discriminatory disparate pay under Title VII and the other statutes, a plaintiff must show "(1) that he was a member of a protected class; (2) that he was paid less than similarly situated non-members of his protected class; and (3) evidence of discriminatory animus." *Spires,* 2019 U.S. Dist. LEXIS 160181 at 10. An employment discrimination plaintiff need not plead a prima facie case of discrimination. *See E.E.O.C.,* 768 F.3d at 254.

67

Rather, a "plaintiff must allege that the employer took adverse action against [him] at least in part for a discriminatory reason, and []he may do so by alleging facts that directly show discrimination or facts that indirectly show discrimination by giving rise to a plausible inference of discrimination." *Vega,* 81 F.3d at 87. Subjecting an employee to unequal pay can, of course, constitute a materially adverse employment action." *Butler v. New York Health & Racquet Club*, 768 F. Supp. 2d 516, 532 (S.D.N.Y. 2011).

The Title VII pay claims need to be addressed separately from the EPA claims because "EPA and Title VII plaintiffs face different burdens." *Lenzi v. Systemax*, 944 F.3d 97, 109 (2d Cir. 2019).

The standard is less demanding in a Title VII case regarding comparators.: "Unlike an EPA plaintiff, a Title VII plaintiff must also produce evidence of discriminatory animus. Title VII plaintiff alleging a discriminatory compensation practice need not establish that she performed equal work for unequal pay." Moreover, "grafting the EPA's equal-work standard onto Title VII would mean "that a woman who is discriminatorily underpaid could obtain no relief—no matter how egregious the discrimination might be—unless her employer also employed a man in an equal job in the same establishment, at a higher rate of pay." *Lenzi v Systemax*, 944 F.3d at 110.

"A plaintiff "is not required to present detailed evidence about comparators at [the motion to dismiss] stage, but the [complaint] must contain a factual allegation that similarly situated comparators exist." *Gittens-Bridges v. City of New York*, 2020 U.S. Dist. LEXIS 102882 (S.D.N.Y. 2020). But to provide a sufficient inference of discrimination at the motion to dismiss stage, a plaintiff must only specify "the identity of a [fe]male comparator who is paid more than he is, and set forth that he and the "comparator work in supposedly substantially [similar] positions." *Spires*, 2019 US Dist. LEXIS 16018l, at 30. Plaintiff made appropriate allegations.

### POINT V: THE DISTRICT COURT'S PROCEDURAL ERRORS PREJUDICED PLAINTIFF'S CASE

The District Court Improperly Considered Materials Not Integral And Disputed By Plaintiff.

A motion brought under Rule 12(b)(6) challenges only the "legal feasibility" of a complaint. *Global Network Commc'ns, Inc. v. City of New York,* 458 F.3d 150, 155 (2d Cir. 2006). "A plaintiff's *reliance* on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion." *see also Menaker v. Hofstra Univ.*, 935 F.3d 20, 27 (2d Cir. 2019). Only materials integral to the complaint can be relied upon. And:

"Even where a document is considered "'integral' to the complaint, it
must be clear on the record that no dispute exists regarding the
authenticity or accuracy of the document. … It must also be clear that
there exist no material disputed issues of fact regarding the relevance of
the document." *Nicosia v. Amazon.com, Inc.,* 834 F.3d 220, 230 (2d Cir.
2016).

The District Court improperly relied on materials disputed by Plaintiff,

apparently because each was referenced or attached to the complaint.  But a

necessary prerequisite is the plaintiff's reliance on a document's terms and

effect – and that they should be integral to it and not be disputed.  Administrator

emails containing Fordham's defenses by Dean Rapaccioli, Dr. Crystal, Dr.

Borun, etc., were considered true. But these were not under oath and presented

non-existing "policies," "customs," and misrepresentations of the Statutes. The

Court used them as "evidence," although non-admissible and strongly disputed,

and relied on them to make factual findings.

Factual Disputes Were Resolved In Favor Of Defendant

Defendant's disputes of Plaintiff's allegations should not be taken as true.

"Because a court that rules on a defendant's motion to dismiss a
complaint 'must accept as true all of the factual allegations contained in
the complaint,' we describe the facts as alleged in the complaint, drawing
all reasonable inferences in the plaintiff's favor, and construing any
ambiguities 'in the light most favorable to upholding the plaintiffs
claim.'" *Duplan*, 888 F.3d at 617.

As this Court stated in *Brown v. Daikin Am., Inc*., 756 F.3d 219 (2d Cir. 2014), "That there may be other explanations for the defendants' employment decisions does not render [Plaintiff's] Brown's allegations of discrimination inadequate as a matter of law" *Id*. at 230.

The District Court's assessment of Plaintiff's claim" was"inconsistent with allegations o" Her Complaint, especially in Order #4. It also attributed to Plaintiff statements she never made.

Plaintiff's unpaid leave was not her voluntary "choice." Instead, the unpaid leave was Plaintiff's way to fight Defendant's conduct since access to Fordham's Statutory due process was denied. Such inconsistencies are similar to those in *Palkovic v. Johnson*, 150 Fed. Appx. 35 (2d Cir. 2005). The Court's narrow construction of the claims here is comparable to *Sce v. City of New York*, 2022 U.S. App LEXIS 5352 (2d. Cir. 2022).

"The choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion." *Lynch v. City of New Y*ork, 952 F.3d 67, 75 (2d Cir. 2020). For example, Plaintiff's allegations are presented in three letters to the Fordham President, but the disputed opposition letters by Dr. Crystal and Dean Rapaccioli were taken as true.

Plaintiff attached such emails containing Fordham's defenses —
specifically to dispute them. The Court denied a "showing of clear error" or that
it "incorrectly resolved" some factual disputes in favor of Fordham. But as an
example, "the Court acknowledged the difference in position between Solomon
and Fordham with respect to … Fordham's customary policies" citing the Third
Amended Complaint ¶¶ ¶517-20, 529-31. SPA 121.

Moreover, only admissible evidence can be considered, even on a
summary judgment motion. *Payne v. Cornell Univ.,* 2022 U.S. App. LEXIS
4082 (2d Cir. 2022). Certainly, the Court cannot rely on defendant's unsworn
emails to dismiss the complaint allegations. Plaintiff explicitly challenged the
propriety of any consideration of Defendants' Exhibits and the Ryan
Affirmations, which are not properly considered on a Rule 12(b)(6) motion.
They are not written from personal knowledge, and Defendants have failed to
establish their admissibility.

Nevertheless, the District Court relied on them, specifically citing Dr.
Crystal's emails of December 23, 2019 and January 9, 2020 (JA303 JA305, 303)
and Dean Rapaccioli's emails of May 24, 2019, JA JA311-312 and August 12,
2020, August 14, 2020. JA JA394-395, 397.

Instead, the content of Plaintiff's letters to the President, including, for example, the December 20, 2019, and January 2, 2020 letters (JA JA300-304), were not even mentioned, although they should have been considered true.

Materials Integral to the Complaint Should Have Been Credited

Plaintiff relied on several documents attached to the Complaint, but their significance was not fully appreciated. Examples include the unanimous 2016 Faculty Senate Anti-Retaliation Resolution in Support of Senators Plaintiff and Dr. Klotz. It opposed the retaliatory discrimination suffered by the two older female *Senators*. That February 26, 2016 Fordham Faculty Senate Resolution is relevant. See ¶467 JA-55, Ex 37 JA- 423. Also, the District Court should have credited the 2008 Faculty Senate Report on Gender Salary Equity as prima facie discrimination evidence. ¶412 JA-44, Ex 5 JA- 144-152.

The Court should have considered the full implications of the two Fordham termination reports of April 12, 2019  (JA317), February 1, 2020 (JA318), and the Post-termination report JA319. (¶380 *JA-025* and Exhibit 23, Doc 95-2, pp. 2, 3, 4).  The act of termination is recorded in the reports, made under submissions by the University to COBRA/ERISA, and reported through the IRS regulations and the US Department of Labor. The *authenticity* of these certifications cannot be disputed. The Court should not have relied on Fordham

efforts to erase their effect by non-sworn denials in their latest motion to dismiss.

## POINT VI: STATE CLAIMS SHOULD BE REINSTATED

Plaintiff's claim for discrimination under the New York State and City Human Rights Law is analyzed under the same framework as a claim under Title VII. Since such an analysis requires reinstatement of the Title VII claim, the Third Amended Complaint's parallel claims under the NYSHRL and NYCHRL should be reinstated under the district court's supplemental jurisdiction, 28 U.S.C. § 1367(a). Plaintiff respectfully requests that the Court exercise supplemental jurisdiction over the other state claims too.

## CONCLUSION

This Court should reverse the District Court's grant of judgment on the pleadings in favor of the Defendants-Appellees.

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B), the word limit of Local Rule 32.1(a)(4) (A), which was extended

by Order to 18,000 words, because excluding the parts of the document

exempted by Fed. R. App. P. 32(f): this document contains 14,802 words.

This document complies with the typeface requirements of Fed. R. App.

P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because

this document has been prepared in a proportionally spaced typeface using

Microsoft Word in 14-point font Time New Roman.


Dated: September 8, 2022                    Respectfully submitted
New York, NY


                                            By: */s/ Esther Solomon*
                                            Esther Solomon
                                            Plaintiff Pro Se